VISCERN HOLDING CORPORATION


STOCKHOLDERS' AGREEMENT


December 30, 2005

**EXECUTION COPY**

STOCKHOLDERS' AGREEMENT (this "Agreement") dated as of December 30, 2005, among Viscern Holding Corporation, a Delaware corporation (the "Corporation"), the Investors (as defined herein) and the Management Stockholders (as defined herein).

WHEREAS, each Stockholder (as defined herein) owns, as of the date hereof, that number of Shares (as defined herein) set forth opposite such Stockholder's name on Annex I attached hereto or Annex II attached hereto, as applicable; and

WHEREAS, the Stockholders believe it to be in the best interest of the Corporation and the Stockholders to provide for the continued stability of the business and policies of the Corporation and its Subsidiaries, as the same may exist from time to time.

NOW THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, the sufficiency of which is hereby acknowledged, the parties agree as follows:

## ARTICLE I

## DEFINITIONS; RULES OF CONSTRUCTION

The following terms have the following meanings:

"Additional Director" shall have the meaning set forth in Section 2.1(b)(iii) hereof.

"Additional Financing" shall have the meaning set forth in Section 6.4 hereof.

"Affiliate" means, with respect to any Person, any (a) director, officer, limited or general partner, member or stockholder holding 5% or more of the outstanding capital stock or other equity interests of such Person, (b) spouse, parent, sibling or descendant of such Person (or a spouse, parent, sibling or descendant of a Person specified in clause (i) above relating to such Person) and (c) other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. The term "control" includes, without limitation, the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreed Purchase Price" shall have the meaning set forth in Section 4.1(b) hereof.

"Alternate Purchase Price" shall have the meaning set forth in Section 4.3(c) hereof.

"Agreement" shall have the meaning set forth in the preamble.

"Approved Sale" shall have the meaning set forth in Section 3.6 hereof.

"Authorized Representative" shall have the meaning set forth in Section 6.2 hereof.

"Board" means the Board of Directors of the Corporation.

"Bylaws" shall mean the bylaws of the Corporation (as the same may be amended, modified or supplemented from time-to-time after the date hereof).

"Call Rights" shall have the meaning set forth in Section 4.1(a)(iii) hereof.

"Cause" shall have the meaning set forth in the applicable Employment Agreement, or, in the absence of an Employment Agreement, shall mean a Termination of Employment for Cause (as defined herein).

"Charter" means the Certificate of Incorporation of the Corporation in effect at the time in question, as the same may be amended, modified or supplemented from time-to-time after the date hereof.

"Common Stock" means the Corporation's common stock, par value $0.001 per share.

"Common Stock Equivalent" means, at any time, one share of Common Stock or the right to acquire, whether or not such right is immediately exercisable, one share of Common Stock, whether evidenced by an option, warrant, convertible security or other instrument or agreement.

"Corporation" shall have the meaning set forth in the preamble.

"Co-Sale Notice" shall have the meaning set forth in Section 3.4(a)(i) hereof.

"Co-Sale Transferee" shall have the meaning set forth in Section 3.4(a) hereof.

"Co-Sale Transferor" shall have the meaning set forth in Section 3.4(a) hereof.

"Electing Party" shall have the meaning set forth in Section 4.2(a) hereof.

"Employment Agreement" means, with respect to any Management Stockholder, the employment agreement entered into between such Management Stockholder and Viscern (as each such Employment Agreement may be amended, restated or otherwise supplemented from time-to-time).

"Equity Securities" means all shares of capital stock of the Corporation, including, without limitation, the Shares, all securities convertible into or exchangeable for shares of capital stock of the Corporation, and all options, warrants, and other rights to purchase or otherwise acquire from the Corporation shares of such capital stock, including any stock appreciation or similar rights, contractual or otherwise.

2

"Exchange Act" means the Securities and Exchange Act of 1934, as amended, or any successor federal statute, and the rules and regulations promulgated thereunder.

"Excluded Securities" means (1) up to (x) 133,333 shares of Common Stock at any time issuable upon the exercise of options granted to directors, officers, bona fide consultants and employees of the Corporation issued pursuant to the 2005 Stock Incentive Plan and (y) 64,371 shares of Common Stock at any time issuable upon the exercise of options granted to directors, officers, bona fide consultants and employees of the Corporation issued pursuant to the 2003 Stock Incentive Plan, (2) stock, warrants or other securities issued to a bank or other financial institution in connection with a financing, not to exceed 100,000 shares of Common Stock in the aggregate, (3) up to 100,000 shares of Common Stock issued in connection with any acquisition by the Corporation approved by the Board (including at least one Investor Director), (4) shares of Common Stock issuable upon the exercise of options, warrants or other securities exchangeable or exercisable for, or convertible into, shares of Common Stock that are outstanding as of the date of this Agreement, (5) shares of Common Stock issued by the Corporation in a Public Offering, (6) Equity Securities of the Corporation issued after the date hereof to give effect to any stock dividend or distribution, stock split, reverse stock split or combination or other similar pro rata recapitalization event affecting any class or series of Common Stock, and (7) securities of the Corporation that are redeemable by the Corporation upon a date certain by the Corporation but are not Common Stock Equivalents.

"Fair Market Value" shall have (i) for the purpose of Article III, the meaning set forth in Section 3.3(e) hereof and (ii) for the purpose of Article IV, the meaning set forth in Section 4.4 hereof.

"Financing Documents" shall have the meaning set forth in Section 3.3(f) hereof.

"First Call Right" shall have the meaning set forth in Section 4.1(a)(i) hereof.

"First Put Right" shall have the meaning set forth in Section 4.1(a)(i) hereof.

"For Cause Repurchase Right" shall have the meaning set forth in Section 3.3(a) hereof.

"Future Stockholder" shall have the meaning set forth in Section 3.1 hereof.

"Good Reason" shall have the meaning set forth in the applicable Employment Agreement.

"Group" means:

(a)    in the case of any Stockholder who is an individual, (i) such Stockholder, (ii) the spouse, parent, sibling or descendants of such Stockholder, (iii) all trusts for the benefit of such Stockholder, (iv) all Persons principally owned by and/or organized or operating for the benefit of any of the foregoing, and (v) all Affiliates of such Stockholder;

(b)    in the case of any Management Stockholder that is an individual, any Permitted Family Transferee of such Stockholder;

3

(c)    in the case of any Stockholder that is a partnership, (i) such Stockholder, (ii) its limited, special and general partners, (iii) any Person to which such Stockholder shall Transfer all or substantially all of its assets, and (iv) all Affiliates and employees of and consultants to, such Stockholder or any of its Affiliates; and

(d)    in the case of any Stockholder which is a corporation or a limited liability company, (i) such Stockholder, (ii) its stockholders or members as the case may be, (iii) any Person to which such Stockholder shall Transfer all or substantially all of its assets, and (iv) all Affiliates of such Stockholder;

"Hefton Director" shall have the meaning set forth in Section 2.1(b)(ii).

"Initial Subscribing Investor" shall have the meaning set forth in Section 3.5(f) hereof.

"Investor Directors" shall have the meaning set forth in Section 2.1(b)(i).

"Investor Nominee" shall have the meaning set forth in Section 3.6(c) hereof.

"Investor Purchase Agreement" means that certain Securities Purchase Agreement dated as of the date hereof between the Investors and the Company.

"Investor Shares" means all Equity Securities of the Corporation held at any time during the term of this Agreement by the Investors.

"Investors" means the Persons set forth on Annex I hereto and any Person who becomes a party to this Agreement as an Investor pursuant to Section 3.1 or 3.2.

"Joinder Agreement" shall have the meaning set forth in Section 3.1 hereof.

"Liquidation" means (i) any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, other than any dissolution, liquidation or winding up in connection with any reincorporation of the Corporation in another jurisdiction, or (ii) any Sale of the Corporation.

"Management Director" shall have the meaning set forth in Section 2.1(a)(ii) hereof.

"Management Stockholder" means the Persons set forth on Annex II hereto and any Person who becomes a party to this Agreement as a Management Stockholder pursuant to Section 3.1 or 3.2.

"Management Stockholder Shares" means all Equity Securities held at any time during the term of this Agreement by any Management Stockholder.

"NASDAQ" means the National Association of Securities Dealers Automated Quotations.

4

"New Securities" means all Equity Securities other than Excluded Securities.

"Original Purchase Price" means the total consideration paid by a Stockholder for each Equity Security so acquired (subject to pro rata adjustment in the event of any stock split, stock dividend or other subdivision of such Equity Security or other similar pro rata recapitalization event affecting such Equity Security); *provided, however,* that the Original Purchase Price of Shares purchased or issued as of the date hereof is the price per share of such Shares as set forth in the Purchase Agreement (subject to adjustment as provided in the Purchase Agreement and further subject to pro rata adjustment in the event of any stock split, stock dividend or other subdivision of such Equity Security or other similar pro rata recapitalization event affecting such Equity Security after the date hereof) and the Original Purchase Price of Rollover Options issued as of the date hereof is the price per share of Shares as set forth in this proviso minus the applicable exercise price.

"Other Accredited Stockholders" shall have the meaning set forth in Section 3.5(f) hereof.

"Other Stockholders" shall have the meaning set forth in Section 3.4(a)(i) hereof.

"Permitted Family Transferee" means, with respect to any Management Stockholder (and each Permitted Transferee), (i) the spouse or any lineal descendant (including adopted children) of such Person, (ii) any trust solely for the benefit of such Person and/or the spouse or lineal descendants (including adopted children) of such Person, (iii) a charitable foundation under the Control of such Person, (iv) a family trust, partnership or limited liability company under the Control of such Person or established solely for the benefit of such Person and/or such Person's spouse or lineal descendants (including adopted children) or for estate planning purposes provided such family trust, partnership or limited liability company remains under the Control of such Person, or (v) the estate of such Person.

"Permitted Transfer" means (a) with respect to a Management Stockholder, any Transfer by such Management Stockholder to (i) a Permitted Family Transferee of such Management Stockholder (ii) any Transferee approved in writing by the Investors holding a majority of the Investor Shares outstanding at such time or (iii) upon Board approval, which approval shall not be unreasonably withheld, another Management Stockholder, and (b) with respect to a Stockholder who is an Investor, any Transfer by such Investor to a member of such Investor's Group.

"Permitted Transferee" means any Person to whom a Permitted Transfer is made.

"Person" shall be construed in the broadest sense and means and includes a natural person, a partnership, a corporation, an association, a joint stock company, a limited liability company, a trust, a joint venture, an unincorporated organization and any other entity and any federal, state, municipal, foreign or other government, governmental department, commission, board, bureau, agency or instrumentality, or any private or public court or tribunal.

"Preemptive Offer" shall have the meaning set forth in Section 3.5(a) hereof.

5

"Preemptive Offer Notice" shall have the meaning set forth in Section 3.5(a) hereof.

"Preemptive Offer Number" shall have the meaning set forth in Section 3.5(b) hereof.

"Preemptive Offer Period" shall have the meaning set forth in Section 3.5(a) hereof.

"Proposed Purchase Price" shall have the meaning set forth in Section 4.2(a)(iii) hereof.

"Pro Rata Amount" means, with respect to any Stockholder, the quotient obtained by dividing (i) the number of Common Stock Equivalents held by such Stockholder, assuming in each case the conversion or exchange of all securities by their terms convertible into or exchangeable for Common Stock and the exercise of all vested and "in the money" options to purchase or rights to subscribe for Common Stock or such convertible or exchangeable securities by (ii) the aggregate number of Common Stock Equivalents held by all Stockholders or class of Stockholders (as applicable), assuming in each case the conversion or exchange of all securities by their terms convertible into or exchangeable for Common Stock and the exercise of all vested and "in the money" options to purchase or rights to subscribe for Common Stock or such convertible or exchangeable securities.

"Public Offering" shall mean the offering of Common Stock on a public exchange.

"Purchase Agreement" means that certain Stock Purchase and Redemption Agreement dated as of the date hereof by and among the Corporation, Viscern and the other parties set forth therein (as the same may be amended, restated or otherwise modified from time-to-time).

"Purchase Notice" shall have the meaning set forth in Section 3.5(b) hereof.

"Put/Call Closing" shall have the meaning set forth in Section 4.2(a)(i) hereof.

"Put/Call Disability" shall have the meaning set forth in Section 4.2(c) hereof.

"Put/Call Disability Notice" shall have the meaning set forth in Section 4.2(c) hereof.

"Put/Call Notice" shall have the meaning set forth in Section 4.2(a) hereof.

"Put/Call Purchase Agreement" shall have the meaning set forth in Section 4.1(b) hereof.

"Put Rights" shall have the meaning set forth in Section 4.1(a)(iii) hereof.

"QIPO" shall mean the first firm commitment underwritten public offering pursuant to an effective registration statement filed on Form S-1 (or its successor form) under the Securities Act of 1933, as amended, resulting in aggregate proceeds (net of underwriting discounts and commissions) to the Corporation of not less than $40,000,000.00 and a per share price of not less than $88.00 per share of Common Stock (as adjusted for any stock dividends, combinations, splits, recapitalizations and related transactions with respect to such shares).

"Qualified Valuator" shall have the meaning set forth in Section 4.3(d) hereof.

"Receiving Party" shall have the meaning set forth in Section 4.2(a) hereof.

"Registration Rights Agreement" means that certain Registration Rights Agreement dated as of the date hereof among the Corporation and the Stockholders (as amended, modified or supplemented from time-to-time).

"Related Person" shall have the meaning set forth in Section 5.1 hereof.

"Repurchase Disability" shall have the meaning set forth in Section 3.3(f) hereof.

"Repurchase Disability Notice" shall have the meaning set forth in Section 3.3(f) hereof.

"Repurchase Date" shall have the meaning set forth in Section 3.3(f) hereof.

"Repurchase Notice" shall mean the notice provided by the Corporation to a Management Stockholder (or a Permitted Transferee of such Management Stockholder) in connection with the Corporation's exercise of a Repurchase Right.

"Repurchase Right" shall have the meaning set forth in Section 3.3(b) hereof.

"Resignation" shall mean the effective date of such Management Stockholder's resignation as an employee of the Corporation or any of its Subsidiaries.

"Resignation Repurchase Right" shall have the meaning set forth in Section 3.3(b) hereof.

"Rollover Options" shall have the meaning set forth in the Purchase Agreement.

"Sale of the Corporation" means (i) the sale of all or substantially all of the Corporation's assets, (ii) the sale or transfer of the outstanding Equity Securities, or (iii) the merger or consolidation of the Corporation with another Person, in each case in clauses (ii) and (iii) above, to or with a Third Party, under circumstances in which the holders (together with any Affiliates of such holders) of the voting power of outstanding Equity Securities, immediately prior to such transaction, own less than 50% in voting power of the outstanding Equity Securities or the voting power of the surviving or resulting corporation or acquirer, as the case may be, immediately following such transaction. A sale (or multiple related sales) of one or more Subsidiaries of the Corporation (whether by way or merger, consolidation, reorganization or sale

of all or substantially all assets or securities) which constitutes all or substantially all of the consolidated assets of the Corporation shall be deemed a Sale of the Corporation.

"Second Call Right" shall have the meaning set forth in Section 4.1(a)(ii) hereof.

"Second Put Right" shall have the meaning set forth in Section 4.1(a)(ii) hereof.

"Securities Act" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations promulgated thereunder.

"Set-Off Right" means the right of the Corporation, pursuant to the terms and conditions of the Purchase Agreement, to set-off against the shares of Common Stock held by the Management Stockholders in satisfaction of certain indemnity obligations of the Management Stockholders arising from time-to-time pursuant to Article XI of the Purchase Agreement.

"Shares" means all Investor Shares and all Management Stockholder Shares.

"Stockholders" means the Investors, the Management Stockholders and any Future Stockholders.

"Subordinated Promissory Note" means an unsecured subordinated promissory note of the Corporation which shall contain, among other terms, the following: (i) a stated maturity of three (3) years, (ii) an interest rate of four percent (4.0%) per annum and (iii) such note shall be prepayable at the option of the Corporation at any time (without penalty), in whole or in part, at its principal amount plus accrued and unpaid interest thereon.

"Subscribing Stockholders" shall have the meaning set forth in Section 3.5(a) hereof.

"Subsidiary" means, with respect to any Person, any other Person the majority of whose Equity Securities or voting securities are directly or indirectly owned or controlled by such Person.

"Tag-Along Notice" shall have the meaning set forth in Section 3.4(c) hereof.

"Termination Date" means the earlier to occur of: (i) the closing of a QIPO and (ii) the closing of a Liquidation.

"Termination of Employment for Cause" shall mean (i) the conviction of a crime involving fraud, theft or dishonesty by the Management Stockholder; (ii) the Management Stockholder's willful and continuing disregard of lawful instructions of the Board or superiors (if any), or the Management Stockholder's willful misconduct in carrying out his or her position and duties of employment; (iii) the continued use of alcohol or drugs by the Management Stockholder to an extent that, in the good faith determination of the Board, such use interferes in any manner with the performance of the Management Stockholder's duties and responsibilities as an employee of the Corporation; (v) the failure by the Management Stockholder to observe material Corporation policies generally applicable to employees of the Corporation, or (vi) the

conviction of the Management Stockholder for violating any law constituting a felony (including the Foreign Corrupt Practices Act of 1977).

"Third Call Right" shall have the meaning set forth in Section 4.1(a)(iii) hereof.

"Third Party" means, with respect to any Stockholder, any Person that is not (i) the Corporation or (ii) a member of the Group of such Stockholder.

"Third Put Right" shall have the meaning set forth in Section 4.1(a)(iii) hereof.

"Transfer" means to sell, transfer, assign, pledge, hypothecate or otherwise dispose of Equity Securities, either voluntarily or involuntarily, directly or indirectly, and with or without consideration excluding (i) by Management Stockholders to the Corporation upon a termination of employment, (ii) by Management Stockholders to the Corporation in connection with a Set-Off Right, or (iii) by Investors to the Corporation.

"Transferee" means any Person to whom a Stockholder shall Transfer Shares.

"Viscern" means Viscern, Inc., a Texas corporation and a wholly-owned Subsidiary of the Corporation.

"Viscern Holdings. LLC" means Viscern Holdings, LLC, a Delaware limited liability company, and any Permitted Transferee thereof.

"2003 Stock Incentive Plan" means the Corporation's 2003 Stock Incentive Plan, by way of assignment and assumption from Viscern (as it may be amended, restated, supplemented or otherwise modified from time-to-time).

"2005 Stock Incentive Plan" means the Corporation's 2005 Stock Incentive Plan (as it may be amended, restated, supplemented or otherwise modified from time-to-time).

## ARTICLE II

## BOARD REPRESENTATION

**2.1.    Board Representation.**

(a)    The Corporation and the Stockholders shall take such corporate actions as may be required to ensure that (i) the number of directors constituting the Board is at all times no greater than five (5), and (ii) the presence of three (3) directors (including at least two (2) Investor Directors) is required to constitute a quorum of the Board. The Board shall initially be set at four (4) members.

(b)    The Board shall be comprised as follows:

(i)    Viscern Holdings, LLC shall be entitled: (A) to nominate three (3) individuals to the Board to serve as directors (the "Investor Directors") until their respective successors are elected and qualified, (B) to nominate each successor to the Investor Directors and (C) to direct the removal from the Board of any director nominated under the foregoing clauses (A) or (B); the Investor Directors shall initially be Mark Rosenbaum, John Henry Moulton and Thomas Drechsler;

(ii)    Carl Hefton or his designee shall be entitled to serve as director (the "Hefton Director") until such time as he ceases to be employed as a full time senior executive officer of Viscern and his Pro Rata Amount is less than five percent, at which time the remaining Management Stockholders shall be entitled (A) to nominate one (1) individual to the Board to serve as a director (the "Management Director") until his respective successor is elected and qualified, (B) to nominate each successor to the Management Director and (C) to direct the removal from the Board of any director nominated under the foregoing clauses (A) or (B); and

(iii)    the Investor Directors and the Hefton Director (or Management Director, as applicable) acting together shall be entitled (A) to nominate one (1) individual to the Board to serve as director (the "Additional Director") until his respective successor is elected and qualified, (B) to nominate each successor to the Additional Director and (C) to direct the removal from the Board of any director nominated under the foregoing clauses (A) or (B). There shall be no initial Additional Director. If the Investor Directors and the Hefton Director are unable to agree as to the nomination, election, removal or replacement of the Additional Director, then the Investor Directors shall be entitled to nominate, elect, remove or replace the Additional Director.

(c)    Each nomination or any proposal to remove from the Board any director shall be made by delivering to the Corporation a notice signed by the party or parties entitled to such nomination or proposal. As promptly as practicable, but in any event within ten (10) days, after delivery of such notice, the Corporation shall take or cause to be taken such corporate actions as may be reasonably required to cause the election or removal proposed in such notice. Such corporate actions may include calling a meeting or soliciting a written consent of the Board, or calling a meeting or soliciting a written consent of the Stockholders.

## 2.2.    Voting Agreement.

Each Stockholder covenants and agrees to vote all Equity Securities held by such Stockholder for (i) the election to the Board of all individuals nominated in accordance with Section 2.1 and for the removal from the Board of all directors proposed to be removed in accordance with Section 2.1, and (ii) the election to each committee of the Board of the Investor Directors nominated in accordance with Section 2.4, and in each case shall take all actions required on its behalf to give effect to the agreements set forth in this Article II. Each Stockholder shall use its respective best efforts to cause each director originally nominated by such Stockholder to vote for the election to the Board of all individuals nominated in accordance with Section 2.1. No Stockholder shall have the ability to remove a director to the extent that such director was not nominated by such Stockholder.

## 2.3.    Interim Director.

The Corporation shall notify each Stockholder of the occurrence of any vacancy in any seat of the Board. If the Stockholders entitled to nominate a successor to fill such vacancy fail to do so within fifteen (15) days after delivery of such notice, such vacancy may be filled in accordance with the Bylaws until a successor has been nominated and elected to the Board in accordance with Sections 2.1 and 2.2 of this Agreement.

## 2.4.    Committees; Subsidiaries.

(a)    Each Stockholder shall use its respective best efforts to cause each director of the Corporation originally nominated by such Stockholder to take such corporate actions as may be reasonably required to ensure that the majority of the members comprising each committee of the Board are Investor Directors.

(b)    The Investor Directors shall have the right (but not the obligation) to cause the Corporation and each Stockholder to take, and each Stockholder shall use its respective best efforts to cause each director of the Corporation originally nominated by such Stockholder to take, such corporate actions as may be reasonably required to ensure that the composition of the board of directors (or similar governing body) of all direct and indirect Subsidiaries of the Corporation is identical to the composition of the Board.

## 2.5.    Meetings; Expenses; Compensation.

(a)    The Corporation shall convene meetings of the Board at least once every three months. Upon any failure by the Corporation to convene any meeting required by this paragraph, an Investor Director shall be empowered to convene such meeting.

(b)    The Corporation shall reimburse each director for his or her reasonable and documented out-of-pocket expenses (including travel) incurred in connection with (i) the attendance of meetings of the Board or any committee thereof and (ii) conducting any other business of the Corporation (or any Subsidiary thereof) requested by the Corporation.

## ARTICLE III

## ISSUANCE AND TRANSFER OF SHARES

## 3.1.    Future Stockholders.

The Corporation shall require each Person that acquires Equity Securities (excluding options to acquire Common Stock) after the date hereof (a "Future Stockholder"), as a condition to the effectiveness of such acquisition, to execute a joinder to this Agreement, substantially in the form attached hereto as Exhibit A (the "Joinder Agreement"), agreeing to be treated as (i) an Investor, if such Person acquires such Equity Securities from an Investor, (ii) a Management Stockholder, if such Person acquires Equity Securities from a Management Stockholder (and such Person's holding period will be deemed to include the period during which the transferring Management Stockholder held (or was deemed to have held) the Equity Securities), or (iii) a Management Stockholder, if such Person is not otherwise an Investor and acquires Equity

Securities from the Corporation, whereupon, in each case, such Person shall be bound by, and entitled to the benefits of, the provisions of this Agreement relating to Investors or Management Stockholders, as the case may be. The Management Stockholders agree to take all actions to permit the Corporation to comply with all of its obligations under all agreements with the Investors. In addition, any Person who becomes a Management Stockholder hereunder has the right, but not the obligation, to become a party to the Registration Rights Agreement as a Management Stockholder thereunder, and the Investors and Management Stockholders agree to take any reasonable actions necessary to permit such joinder.

**3.2.   Limitations on Transfers.**

(a)     No Transfer of any Equity Securities by any Stockholder shall become effective unless and until (i) the Transferee (unless already subject to this Agreement) executes and delivers to the Corporation a Joinder Agreement, agreeing to be treated in the same manner as the transferring Stockholder (i.e., as either an Investor or a Management Stockholder) and (ii) such Transfer is either (x) a Permitted Transfer or (y) otherwise made in compliance with this Article III. Upon such Transfer and such execution and delivery, the Transferee shall be bound by, and entitled to the benefits of, this Agreement with respect to the transferred Equity Securities in the same manner as the transferring Stockholder. The provisions regarding Transfers of Equity Securities contained in this Article III shall apply to all Equity Securities now owned or hereafter acquired by a Stockholder. Any Transfer of Equity Securities by a Stockholder not made in accordance with this Article III shall be void *ab initio*.

(b)     Except as otherwise set forth in Sections 3.3, 3.4, 3.6 and Article IV hereof, without the prior written consent of the Investors holding a majority of the Investor Shares, in no case may a Management Stockholder Transfer any of its Equity Securities (or any portion thereof) to any Person, other than pursuant to a Permitted Transfer.

**3.3.   Repurchase Right.**

(a)     Management Stockholder Terminated for Cause. In the event that a Management Stockholder's employment with Viscern is terminated for Cause at any time after the date hereof, the Corporation (or its designee) shall have the right (but not the obligation), upon delivery of a Repurchase Notice to such Management Stockholder no later than thirty (30) days after such termination of employment, to repurchase from such Management Stockholder (and each of his Permitted Transferees) all or any part of the Management Stockholder Shares owned by such Management Stockholder (and each of his Permitted Transferees) at any time (a "For Cause Repurchase Right").

(b)     Management Stockholder Resignation. In the event that, at any time prior to the third anniversary of the date hereof, a Management Stockholder's employment with Viscern is terminated as a result of such Management Stockholder's Resignation other than for Good Reason, the Corporation shall have the right (but not the obligation), upon delivery of a Repurchase Notice to such Management Stockholder no later than thirty (30) days after such Resignation, to repurchase from such Management Stockholder (and each of his Permitted Transferees) all or any part of the Management Stockholder Shares owned by such Management

Stockholder (and each of his Permitted Transferees) (a "Resignation Repurchase Right", and collectively with a For Cause Repurchase Right, each a "Repurchase Right").

      (c)     Payment of the Repurchase Price.

         (i)    The purchase price payable by the Corporation upon exercise of a Resignation Repurchase Right shall be the Fair Market Value (as defined below) of the Management Stockholder Shares subject to the Resignation Repurchase Right on the date of termination of such Management Stockholder's employment with Viscern.

         (ii)    The purchase price payable by the Corporation upon exercise of a For Cause Repurchase Right shall be the lesser of: (i) the Fair Market Value of the Management Stockholder Shares subject to the For Cause Repurchase Right on the date of termination of such Management Stockholder's employment with Viscern and (ii) the Original Purchase Price.

         (iii)    The closing of a Repurchase Right shall occur no later than ninety (90) days following the delivery of a Repurchase Notice (the "Repurchase Date"). The repurchase price shall be paid in cash (subject to the limitations set forth in Section 3.3(f) below); provided, however, that if such Repurchase Right is a For Cause Repurchase Right, the Corporation shall have the option, in its sole discretion, to pay the Repurchase Price by issuing to such Management Stockholder a Subordinated Promissory Note in lieu of cash.

      (d)     Procedures. On the Repurchase Date, the Management Stockholder shall transfer the Management Stockholder Shares subject to the Repurchase Notice to the Corporation, free and clear of all liens and encumbrances (other than pursuant to securities laws or this Agreement), by delivering to the Corporation the certificates representing the Management Stockholder Shares to be purchased, duly endorsed for transfer to the Corporation or accompanied by a stock power duly executed in blank, and the Corporation shall pay to the Management Stockholder the repurchase price. The Corporation and the Management Stockholder each shall use his, her or its reasonable efforts to expedite all proceedings contemplated hereunder to obtain a determination of the repurchase price of the Management Stockholder Shares at the earliest practicable date.

      (e)     "Fair Market Value". Solely for purposes of this Article III, the "Fair Market Value" of Management Stockholder Shares, as of any date of determination, shall be determined as follows:

         (i)    If such Management Stockholder Shares are listed on one or more national securities exchanges (within the meaning of the Securities Exchange Act of 1934, as amended), each such Management Stockholder Share so listed to be repurchased shall be valued at the closing price of such Management Stockholder Share on the principal exchange on which such shares are then trading on the most recent trading day preceding such date of determination;

         (ii)    If such Management Stockholder Shares are not traded on a national securities exchange but the Corporation is quoted on NASDAQ or a successor

quotation system and such Management Stockholder Shares are listed as a national market issue under the NASD National Market System, each such Management Stockholder Share to be repurchased shall be valued at the mean between the closing representative bid and asked prices for such Management Stockholder Share on the most recent trading day preceding such date of determination as reported by NASDAQ or such successor quotation system; or

> (iii)    If such Management Stockholder Shares are not publicly traded on a national securities exchange and are not quoted on NASDAQ or a successor quotation system, the Fair Market Value of such Management Stockholder Shares to be repurchased shall be determined in good faith by the Board.  As a general matter, in determining Fair Market Value pursuant to this Section 3.3(e)(iii), the Board shall use its reasonable efforts to apply and follow the guidelines applicable to the Qualified Valuator in determining Fair Market Value as set forth in Section 4.4 below.

> (f)    <u>Repurchase Rights Prohibited</u>.  Notwithstanding anything to the contrary contained herein, in the event that the Corporation shall not be permitted to purchase any Management Stockholder Shares upon exercise of a Repurchase Right because: (A) the purchase of Management Stockholder Shares would render the Corporation or its Subsidiaries unable to meet their obligations in the ordinary course of business taking into account any pending or proposed transactions, capital expenditures or other budgeted cash outlays by the Corporation, including, without limitation, any proposed acquisition of any other entity by the Corporation or any of its Subsidiaries; (B) the Corporation is prohibited from purchasing the Management Stockholder Shares by applicable law restricting the purchase by a corporation of its own shares or would cause or make it likely that the Corporation would become the subject of a federal bankruptcy proceeding or would otherwise cause the Corporation to become insolvent; or (C) the purchase of Management Stockholder Shares would constitute a breach of, default, or event of default under, or is otherwise prohibited by, the terms of any loan agreement or other agreement or instrument to which the Corporation or any of its Subsidiaries is a party (the "<u>Financing Documents</u>") or the Corporation is not able to obtain the requisite consent of any of its senior lenders to the purchase of the Management Stockholder Shares (each of the events described in (A) through (C) above being a "<u>Repurchase Disability</u>"), then the Corporation shall provide written notice to the Management Stockholder with respect to whom the Repurchase Right has been exercised (a "<u>Repurchase Disability Notice</u>") specifying the nature of the Repurchase Disability.  The Corporation shall thereafter repurchase the Management Stockholder Shares described in the Repurchase Notice as soon as reasonably practicable (but in no event later than ninety (90) days) after all Repurchase Disabilities cease to exist (or the Corporation may elect, but shall have no obligation, to issue a Subordinated Promissory Note to such Management Stockholder.  Notwithstanding anything to the contrary contained in this Agreement, if the Corporation claims a Repurchase Disability, the purchase price for purposes of such Repurchase Right shall be the greater of (i) the price determined in accordance with Section 3.3(c) and (ii) the Fair Market Value on the date the Repurchase Disability shall cease to exist.

## 3.4.    <u>Co-Sale Rights</u>.

> (a)    Subject to compliance with the other applicable provisions of this Agreement, if at any time an Investor (the "<u>Co-Sale Transferor</u>") proposes to Transfer any

14

Investor Shares (other than pursuant to a Permitted Transfer) to any Third Party (the "Co-Sale Transferee"), the Co-Sale Transferor shall, at least thirty (30) days prior to the closing of such Transfer:

> (i)      Deliver a notice (the "Co-Sale Notice") to all other Stockholders that hold Equity Securities of the same class, series or type or convertible or exercisable into the same class, series or type (the "Other Stockholders") detailing the terms and conditions of the proposed Transfer; provided, however, that such Co-Sale Notice shall indicate that the Co-Sale Transferee has been informed of the co-sale rights provided for in this Section 3.4 and has agreed to purchase Equity Securities in accordance with the terms hereof.

> (ii)     The Co-Sale Transferor shall not be permitted to Transfer any Equity Securities to the Co-Sale Transferee unless the Other Stockholders are permitted to Transfer their respective Pro Rata Amount of the aggregate number of Equity Securities to which the Co-Sale Offer relates.

(b)     The Co-Sale Transferor shall, in addition to complying with the provisions of this Section 3.4, comply with the other provisions of this Article III.

(c)     Within thirty (30) days after delivery of the Co-Sale Notice, each Other Stockholder may elect to participate in the proposed Transfer by delivering to such Co-Sale Transferor a notice (the "Tag-Along Notice") specifying the number of Equity Securities (up to his, her or its Pro Rata Amount (based upon the aggregate number of Equity Securities of the Corporation outstanding at such time) with respect to which such Other Stockholder shall exercise his, her or its rights under this Section 3.4. Each Tag-Along Notice shall include only Equity Securities of the same class, series or type being Transferred or exercisable or convertible into the same class, series or type being Transferred by the Co-Sale Transferor. For purposes of this Section 3.4, each Other Stockholder may aggregate his, her or its Pro Rata Amount among Other Stockholders in his, her or its Group to the extent that such Other Stockholders in his, her or its Group do not elect to sell their respective Pro Rata Amounts.

(d)     Any Equity Securities requested to be included in any Co-Sale Notice shall be Transferred on at least the same terms and conditions as are set forth in the Co-Sale Notice, provided, however, that the price for each Common Stock Equivalent shall be (i) the product of (x) the price per share of Common Stock Transferred or to be Transferred by the Co-Sale Transferor and (y) the number of shares of Common Stock into which such Common Stock Equivalent is then convertible in accordance with the Charter or exercisable in accordance with its terms, minus the per share exercise price (if applicable).

**3.5.**    **Preemptive Rights.**

(a)     Prior to the occurrence of a QIPO, if the Corporation proposes to issue any New Securities to any Person, the Corporation shall, before such issuance, deliver to the Stockholders (other than those Stockholders that are not then "accredited investors" (as such term is defined in Rule 501 of the Securities Act)) (collectively, the "Subscribing Stockholders") a written notice offering to issue to the Subscribing Stockholders such New Securities upon the

terms set forth in this Section 3.5 (the "Preemptive Offer Notice"). The Preemptive Offer Notice shall state that the Corporation proposes to issue New Securities and shall set forth the number and terms and conditions (including the purchase price) of such New Securities. The offer (the "Preemptive Offer") shall remain open and irrevocable for a period of ten (10) days (the "Preemptive Offer Period") from the date of its delivery.

(b)    Each Subscribing Stockholder may accept the Preemptive Offer by delivering to the Corporation a notice (the "Purchase Notice") at any time during the Preemptive Offer Period. The Purchase Notice shall state the number (the "Preemptive Offer Number") of New Securities such Subscribing Stockholder desires to purchase. If the sum of all Preemptive Offer Numbers exceeds the number of New Securities, the New Securities shall be allocated among the Subscribing Stockholders that delivered a Purchase Notice in accordance with their respective Pro Rata Amount (based on the aggregate number of Common Stock Equivalents outstanding at the time of the Preemptive Offer and held by all Subscribing Stockholders).

(c)    The issuance of New Securities to the Subscribing Stockholders who delivered a Purchase Notice shall be made on a business day, as designated by the Corporation, not less than ten (10) and not more than sixty (60) days after expiration of the Preemptive Offer Period on those terms and conditions of the Preemptive Offer not inconsistent with this Section 3.5.

(d)    If the number of New Securities exceeds the sum of all Preemptive Offer Numbers, the Corporation may issue such excess or any portion thereof on the terms and conditions set forth in the Preemptive Offer to any Person within ninety (90) days after expiration of the Preemptive Offer Period. If such issuance is not made within such 90-day period or is proposed to be made on terms materially different from those terms set forth in the Preemptive Offer, the restrictions provided for in this Section 3.5 shall again become effective.

(e)    For purposes of this Section 3.5, each Subscribing Stockholder may aggregate his, her or its Pro Rata Amount among other Subscribing Stockholders in his, her or its Group to the extent that other Subscribing Stockholders in his, her or its Group do not elect to purchase their respective Pro Rata Amounts.

(f)    Notwithstanding anything to the contrary contained herein, the Corporation may, in order to expedite the issuance of the New Securities under this Section 3.5, issue all or a portion of the New Securities to one or more Persons (each, an "Initial Subscribing Investor"), without complying with the provisions of this Section 3.5; provided, that prior to such issuance, either (i) each Initial Subscribing Investor agrees to offer to sell to each Stockholder who is an accredited investor (as such term is defined in Rule 501 under the Securities Act) and who is not an Initial Subscribing Investor (each such Stockholder, an "Other Accredited Stockholder") his or its respective Pro Rata Amount of such New Securities on the same terms and conditions as issued to the Initial Subscribing Investors or (ii) the Corporation shall offer to sell an additional amount of New Securities to each Other Accredited Stockholder only in an amount and manner which provides such Other Accredited Stockholders with rights substantially similar to the rights outlined in Sections 3.5(b) and 3.5(c). The Initial Subscribing Investors or the Corporation, as applicable, shall offer to sell such New Securities to each Other Accredited

Stockholder within sixty (60) days after the closing of the purchase of the New Securities by the Initial Subscribing Investors.

### 3.6.     Approved Sale; Sale of the Corporation.

      (a)     At any time that the holders of a majority of all then outstanding Investor Shares shall approve a Sale of the Corporation to one or more Third Parties on an arms-length basis (an "Approved Sale"), each Stockholder and the Corporation shall consent to and raise no objections against the Approved Sale, and if the Approved Sale is structured as (A) a merger or consolidation of the Corporation, each Stockholder shall, and hereby does, waive any dissenter's rights, appraisal rights or similar rights in connection with such merger or consolidation and hereby instructs the Board to vote in favor of such Approved Sale, or (B) a sale of shares of capital stock, each Stockholder shall, and hereby does, agree to sell their Equity Securities on the terms and subject to the conditions approved by such Investors, but in any event, at the same price per share with respect to the same type of Equity Securities as received by the Investors. All Stockholders and the Corporation shall take all necessary and desirable actions in connection with the consummation of the Approved Sale, including, without limitation, the execution of such agreements and such instruments and other actions reasonably necessary to (1) provide the representations, warranties, indemnities (based on their Pro Rata Share), covenants, conditions, escrow agreements and other provisions and agreements relating to such Approved Sale and (2) to effectuate the allocation and distribution of the aggregate consideration upon the Approved Sale as set forth below. The Stockholders shall not be required to comply with, and shall have no rights under, Section 3.1 through 3.5 in connection with any Approved Sale.

      (b)     The Corporation shall provide the Stockholders with written notice of any Approved Sale at least ten (10) days prior to the consummation thereof setting forth in reasonable detail the terms (including price, time and form of payment) of any Approved Sale. No Stockholder shall be obligated to pay more than his or its pro rata amount of reasonable expenses incurred (based on the proportion of the aggregate transaction consideration received) in connection with a consummated Approved Sale to the extent such expenses are incurred for the benefit of all Stockholders and are not otherwise paid by the Corporation or the acquiring party (expenses incurred by or on behalf of a Stockholder for its or his sole benefit not being considered expenses incurred for the benefit of all Stockholders).

      (c)     Each Stockholder and the Corporation hereby grants an irrevocable proxy and power of attorney to any nominee of the majority of all the outstanding Investor Shares (which may be an Investor) (the "Investor Nominee") to take all necessary actions and execute and deliver all documents deemed necessary and appropriate by such Person to effectuate the consummation of any Approved Sale. The Stockholders hereby agree to indemnify, defend and hold the Investor Nominee harmless (severally in accordance with their pro rata share of the consideration received in any such Approved Sale (and not jointly and severally)) against all liability, loss or damage, together with all reasonable costs and expenses (including reasonable legal fees and expenses), relating to or arising from its exercise of the proxy and power of attorney granted hereby.

# ARTICLE IV

## PUT/CALL ARRANGEMENT

**4.1.    Put and Call Right .**

(a)    Each Management Stockholder shall have the following rights to cause the Corporation to repurchase, and the Corporation shall have the following rights to cause each Management Stockholder to sell, in each case pursuant to the terms and conditions set forth in this Article IV.

(i)    At any time from and after the fourth anniversary of the date hereof, (a) each Management Stockholder (together with its Permitted Transferees) shall have the right (the "First Put Right") to cause the Corporation to purchase up to 33 1/3% of such Management Stockholder's Management Stockholder Shares, and (b) the Corporation shall have the right (the "First Call Right") to cause each Management Stockholder to sell up to 33 1/3% of such Management Stockholder's Management Stockholder Shares to the Corporation; provided, however, that no Management Stockholder shall be able to exercise the First Put Right unless (x) the number of Management Stockholder Shares being offered pursuant to the First Put Right is equal to at least 15% of the aggregate Management Stockholder Shares held by all Management Stockholders (or such Management Stockholders' Permitted Transferees) at such time and (y) such Management Stockholder Shares being offered pursuant to the First Put Right have been held by such Management Stockholder (or such Management Stockholder's Permitted Transferees) for at least four years following the date hereof (including periods of ownership of Common Stock Equivalents that were converted into or exercised for such Management Stockholders Shares);

(ii)    At any time from and after the first anniversary of the Put/Call Closing (as defined below) relating to the First Put Right or the First Call Right, as the case may be, (a) each Management Stockholder (together with its Permitted Transferees) shall have the right (the "Second Put Right") to cause the Corporation to purchase up to 50% of such Management Stockholder's remaining Management Stockholder Shares, and (b) the Corporation shall have the right (the "Second Call Right") to cause each Management Stockholder to sell up to 50% of such Management Stockholder's remaining Management Stockholder Shares to the Corporation; provided, however, that no Management Stockholder shall be able to exercise the Second Put Right unless (x) the number of Management Stockholder Shares being offered pursuant to the Second Put Right is equal to at least 15% of the aggregate Management Stockholder Shares held by all Management Stockholders (or such Management Stockholders' Permitted Transferees) at such time and (y) such Management Stockholder Shares being offered pursuant to the Second Put Right have been held by such Management Stockholder (or such Management Stockholder's Permitted Transferees) for at least five years following the date hereof (including periods of ownership of Common Stock Equivalents that were converted into or exercised for such Management Stockholders Shares); and

(iii)    At any time from and after the first anniversary of the Put/Call Closing relating to the Second Put Right or the Second Call Right, as the case may be, (a) each Management Stockholder (together with its Permitted Transferees) shall have the right (the "Third Put Right", and together with the First Put Right and the Second Put Right, the "Put Rights") to cause the Corporation to purchase all of such Management Stockholder's remaining Management Stockholder Shares and (b) the Corporation shall have the right (the "Third Call Right", and, together with the First Call Right and the Second Call Right, the "Call Rights") to cause each Management Stockholder to sell all of such Management Stockholder's remaining Management Stockholder Shares to the Corporation; provided, however, that no Management Stockholder shall be able to exercise the Third Put Right unless (x) the number of Management Stockholder Shares being offered pursuant to the Third Put Right is equal to at least 15% of the aggregate Management Stockholder Shares held by all Management Stockholders (or such Management Stockholders' Permitted Transferees) at such time and (y) such Management Stockholder Shares being offered pursuant to the Third Put Right have been held by such Management Stockholder (or such Management Stockholder's Permitted Transferees) for at least six years following the date hereof (including periods of ownership of Common Stock Equivalents that were converted into or exercised for such Management Stockholders Shares).

Notwithstanding anything to the contrary contained in this Section 4.1(a), a Management Stockholder may only exercise a Put Right with respect to Management Stockholders Shares that are shares of Common Stock (and not options or other similar Common Stock Equivalents).

(b)    Notwithstanding anything to the contrary contained in Section 4.1(a) above, to the extent that a Management Stockholder is unable to exercise a Put Right as a result of the failure to meet the 15% requirement set forth in any of Sections 4.1(a)(i)(x), Section 4.1(a)(ii)(x) or Section 4.1(a)(iii)(x), the Corporation shall nevertheless effect a Put Right solely in such circumstances where the Management Stockholder exercising such Put Right and the Corporation mutually agree on a purchase price for such Management Stockholder Shares being offered pursuant to such Put Right within thirty (30) days of the Corporation receiving notice of the exercise of such Put Right.  If the Corporation and such Management Stockholder are unable to mutually agree on a purchase price within such thirty (30) day period, for any reason or no reason, the Corporation shall have no obligation to purchase such Management Stockholder Shares and the Put Right will be deemed to have been revoked by such Management Stockholder at such time.

(c)    The purchase and sale of the Management Stockholder Shares pursuant to the exercise of a Put Right or a Call Right shall be effected pursuant to a purchase agreement (the "Put/Call Purchase Agreement") containing, among other things, the following terms and conditions:  (i) the purchase price of the Management Stockholder Shares, determined in accordance with Section 4.3 (the "Agreed Purchase Price"), (ii) customary representations, warranties, covenants, conditions, indemnities, confidentiality and other provisions in the reasonable discretion of the Board, acting in good faith and taking into account the size and the form of the proposed transaction.  In addition, the Management Stockholder may be bound by a customary non-competition and non-solicitation agreement, on such terms and subject to such conditions as the Board may reasonably set forth.

**4.2.   Put/Call Notice**

(a)    If (i) a Management Stockholder desires to exercise a Put Right or (ii) the Corporation desires to exercise a Call Right, the electing party (the "Electing Party") must deliver to the other party (the "Receiving Party") a notice (the "Put/Call Notice") that contains, among other items, the following information:

(i)    The proposed closing date for the purchase and sale of the Management Stockholder Shares; *provided, however,* that such date shall not be earlier than ninety (90) days after receipt of a Put/Call Notice by the Receiving Party; *provided, further, however,* that the actual closing date shall be fixed as sixty (60) days after the Agreed Purchase Price has been finally determined (each such closing, a "Put/Call Closing");

(ii)    The amount of the Management Stockholder Shares to be included in such Put/Call Closing;

(iii)    The proposed purchase price for the Management Stockholder Shares, which shall be the Electing Party's estimate of the Fair Market Value of the Management Stockholder Shares (as determined below) (the "Proposed Purchase Price"); and

(iv)    Supporting documentation setting forth the Electing Party's calculation of the Fair Market Value of the Management Stockholder Shares.

(b)    A Put/Call Notice shall be irrevocable and may not be withdrawn by the Electing party unless otherwise agreed to by the Receiving Party.

(c)    Notwithstanding anything to the contrary contained herein, in the event that the Corporation shall not be permitted to purchase any Management Stockholder Shares pursuant to a Put Right or a Call Right because: (A) the purchase of Management Stockholder Shares would render the Corporation or its Subsidiaries unable to meet their obligations in the ordinary course of business taking into account any pending or proposed transactions, capital expenditures or other budgeted cash outlays by the Corporation, including, without limitation, any proposed acquisition of any other entity by the Corporation or any of its Subsidiaries; (B) the Corporation is prohibited from purchasing the Management Stockholder Shares by applicable law restricting the purchase by a corporation of its own shares or would cause or make it likely that the Corporation would become the subject of a federal bankruptcy proceeding or would otherwise cause the Corporation to become insolvent; or (C) the purchase of Management Stockholder Shares would constitute a breach of, default, or event of default under, or is otherwise prohibited by, the terms of any loan agreement or other Financing Documents or the Corporation is not able to obtain the requisite consent of any of its senior lenders to the purchase of the Management Stockholder Shares (each of the events described in (A) through (C) above being a "Put/Call Disability"), then the Corporation shall provide written notice to the Management Stockholders exercising the Put Right (a "Put/Call Disability Notice") specifying the nature of the Put/Call Disability. The Corporation shall thereafter purchase the Management Stockholder Shares described in the Put/Call Notice as soon as reasonably practicable (but in no