event more than thirty (30) days) after all Put/Call Disabilities cease to exist (or the Corporation may elect, but shall have no obligation, to issue a Subordinated Promissory Note to such Management Stockholder). Notwithstanding anything to the contrary in this Agreement, if the Corporation claims a Put/Call Disability, the purchase price shall be the greater of the Fair Market Value on (i) the date of the Put/Call Notice or (ii) the date the Put/Call Disability ceases to exist.

## 4.3.    Process Upon Receipt of Put/Call Notice

(a)    Proposed Purchase Price. Within thirty (30) days of receipt of a Put/Call Notice, the Receiving Party shall deliver a written notice to the Electing Party indicating whether or not it agrees with the Proposed Purchase Price. If the Receiving Party agrees with the Proposed Purchase Price, the Proposed Purchase Price shall be deemed to be the Agreed Purchase Price. If the Receiving Party objects to the Proposed Purchase Price, the Receiving Party shall provide to the Electing Party an alternate purchase price for the Management Stockholder Shares, which shall be the Receiving Party's estimate of the Fair Market Value of the Management Stockholder Shares (as determined below) (the "Alternate Purchase Price"). The Receiving Party shall also deliver to the Electing Party supporting documentation setting forth its calculation of the Fair Market Value of the Management Stockholder Shares.

(b)    Alternative Purchase Price. Within 30 days of receipt of the Alternate Purchase Price, the Electing Party shall deliver a written notice to the Receiving Party indicating whether or not it agrees with the Alternate Purchase Price. If the Electing Party agrees with the Alternate Purchase Price, the Alternate Purchase Price shall be deemed to be the Agreed Purchase Price. If the difference between the Alternate Purchase Price and the Proposed Purchase Price is less than or equal to five percent 5%, then the Agreed Purchase Price shall be the average of the Alternate Purchase Price and the Proposed Purchase Price. If the Electing Party objects to the Alternate Purchase Price and an agreement cannot otherwise be reached, the Agreed Purchase Price shall be determined by the Qualified Valuator (as defined below) as provided below.

(i)    If the Electing Party and the Receiving Party do not agree to an Agreed Purchase Price as set forth in Section 4.3(a) or (b) above, then the Proposed Purchase Price and the Alternate Purchase Price shall be submitted to the Qualified Valuator.

(ii)    The Electing Party and the Receiving Party shall submit to the Qualified Valuator the documentation supporting the Proposed Purchase Price or the Alternate Purchase Price, as the case may be, that was previously delivered to the other party.

(iii)    The Qualified Valuator shall have the authority to select either the Proposed Purchase Price or the Alternate Purchase Price to be the Agreed Purchase Price, but shall not have the discretion to choose any other amount.

(iv)    The Corporation shall advise the Qualified Valuator about negotiations with respect to any possible Sale of the Corporation if, in the reasonable

discretion of the Board, a meaningful letter of intent for such Sale of the Corporation has been submitted to the Corporation and will provide the relevant documentation to substantiate such negotiations; *provided, however,* that the Corporation shall not be required to comply with the foregoing to the extent that providing such documentation would be reasonably expected to give rise to a breach of confidentiality on the part of the Corporation.

(v)    In determining whether to select the Proposed Purchase Price or the Alternate Purchase Price to be the Agreed Purchase Price, the Qualified Valuator shall select the price that is closest to the Qualified Valuator's independent calculation of Fair Market Value (as determined below) for the Management Stockholder Shares.

(vi)    The determination of the Agreed Purchase Price by the Qualified Valuator shall be binding and conclusive on the parties (absent fraud or manifest error).

(c)    <u>Qualified Valuator</u>. The Qualified Valuator shall be a reputable appraiser or investment bank with industry experience and a national reputation in good standing that is not an Affiliate of the Management Stockholders or the Corporation. If the Corporation and the Management Stockholders are not able to agree on who will serve as the Qualified Valuator, then each party shall select an independent financial advisor. The independent financial advisors shall then select the Qualified Valuator.

**4.4.    <u>Fair Market Value</u>.** Solely for purposes of this Article IV, "Fair Market Value" shall be determined as set forth below:

(a)    In determining the Fair Market Value of the Management Stockholder Shares, the Qualified Valuator shall use accepted valuation practices customarily used by reputable independent appraisers, including, without limitation, comparable company analysis and discounted cash flow analysis (using appropriate stand-alone valuation methodologies with no control premium and no minority or liquidity discount), at the time the Fair Market Value of the Management Stockholder Shares is determined and shall give due regard to the then-existing assets, liabilities (including, without limitation, indebtedness and the liability under the management incentive plan), contingencies (including contingencies for matters not known at the time of the valuation), earnings, prospects and risks of the Corporation and any other factors the Qualified Valuator deems relevant.

(b)    In determining the Fair Market Value of the Management Stockholder Shares, the Qualified Valuator shall take into account the negative impact to the prospects of the Corporation resulting from the departure of a Management Stockholder, if applicable.

(c)    The Qualified Valuator shall take into account the terms of the Put/Call Purchase Agreement (including any exhibits thereto). The Qualified Valuator shall also review all disclosure schedules to the Put/Call Purchase Agreement and, to the extent such items would affect the Fair Market Value of the Management Stockholder Shares, take into account any scheduled exceptions thereto.

**4.5.    Form of Consideration.**    To the extent permitted under the Financing Documents and applicable law, amounts due in respect of the Management Stockholder Shares shall be paid in cash. Any amounts not permitted to be paid in cash shall be paid by issuance of a Subordinated Promissory Note.

**4.6.    Expenses.**    The fees and expenses of the Qualified Valuator will be shared equally by the Electing Party and the Receiving Party. Each party shall be solely liable for any other advisor it retains, including any independent financial advisor.

## ARTICLE V

## PROTECTIVE PROVISIONS

**5.1.    Investor Director Protective Covenants.**

The Corporation shall not take any of the following actions without the prior written approval of at least a majority of the Investor Directors (and shall inform all such other directors of any such actions so taken as necessary):

(a)    (A) issue or authorize any options (other than (x) options not to exceed 133,333 issued pursuant to the Corporation's 2005 Stock Incentive Plan or (y) options not to exceed 64,371 issued pursuant to the Corporation's 2003 Stock Incentive Plan), (B) issue any stock appreciation or similar rights, (C) create a bonus plan or program or issue any bonuses or agree to issue bonuses, the payment of which is contingent upon the occurrence of a Liquidation, change of control or similar event, (D) redeem, repurchase or acquire any Equity Securities, (E) split, combine or reclassify any Equity Securities, (F) issue debt for borrowed money or refinance any existing debt, or (G) re-price any stock options;

(b)    pledge any assets (other than in connection with capital leases or other financings that have been previously approved by the holders of a majority of the Investor Shares);

(c)    make any changes in accounting methods or policies (other than as required by U.S. generally accepted accounting principles), or any change in the Corporation's auditors;

(d)    effect any sales or other dispositions of assets exceeding $50,000;

(e)    enter into any contract or agreement other than in the ordinary course of business consistent with past practice that would be material to the Corporation, taken as a whole, for consideration in excess of $25,000.

(f)    adopt an annual budget, operating budget or business plan;

(g)    effect any changes in the strategic direction or lines of business of the Corporation not specified in the business plan approved by the Board;

(h)    create any Subsidiary;

(i)    make investments in any other Person;

(j)    commence any litigation or binding dispute resolution process (other than in respect of any breach of or claim arising under this Agreement), or settle or compromise any pending or threatened suit, action, claim or other dispute that (i) relates to the transactions contemplated hereby or (ii) the settlement or compromise of which would involve more than $10,000 or that would otherwise be material to the Corporation.

(k)    commence or terminate the employment of the chief executive officer, chief financial officer, chief operating officer or any other senior executive officer or division president of the Corporation, or amend or revise the terms of any employment agreement with any such officer;

(l)    enter into any contract or agreement with any officer, director, stockholder, Affiliate or employee (each a "Related Person") of the Corporation or any Subsidiary, including, without limitation, for the sale or repurchase of any of the Corporation's Equity Securities (other than (A) repurchase rights existing on or prior to the date of this Agreement or (B) any contract or agreement entered into with such Related Person on terms not less favorable to the Corporation or Subsidiary, as the case may be, than would be obtained in a transaction with a Person which is not a Related Person);

(m)    grant any exclusive rights to any intellectual property of the Corporation;

(n)    grant any exclusive distribution rights;

(o)    enter into any contract or arrangement with respect to the receipt by the Corporation (or any Subsidiary thereof) of either (i) investment banking services with respect to material issuances of securities or (ii) advisory services with respect to mergers and acquisitions involving the Corporation (or any Subsidiary thereof);

(p)    approve any Additional Financing;

(q)    commence any litigation or any binding dispute resolution process, or settle or compromise any pending or threatened suit, action, claim or other dispute, the settlement or compromise of which would involve more than $50,000 or that would otherwise be material to the Corporation; or

(r)    agree to take any of the foregoing actions.

**5.2.**    **Investor Stockholders Protective Covenants.**

The Corporation shall not take any of the following actions without the prior written approval of the holders of a majority of all outstanding Investor Shares (and shall inform all directors of any such actions so taken as necessary):

(a)    issue or authorize any Equity Securities other than Excluded Securities;

(b)    effect any acquisition by the Corporation of any business (whether by purchase of stock or assets) or any expenditures in excess of $50,000 not included in the annual operating budget;

(c)    take any action that could result in a Liquidation;

(d)    effect any changes in the Charter or Bylaws of the Corporation;

(e)    alter the size of the Board;

(f)    in any manner, directly or indirectly, and whether in cash, securities, dividends or other property, pay or declare or set apart for payment, any dividends or make any other distribution on or with respect to any Equity Securities;

(g)    initiate a process with respect to, or consummate, a Public Offering; or

(h)    agree to take any of the foregoing actions.

**5.3.    Subsidiaries.**

At any time that the Corporation has any Subsidiary, it shall not permit such Subsidiary to take any of the foregoing actions set forth in Section 5.1 or 5.2 (with all references to the Corporation deemed to be references to such Subsidiary) without the prior written approval of an Investor Director or a majority of the outstanding Investor Shares, as the case may be.

## ARTICLE VI

## ADDITIONAL AGREEMENTS

**6.1.    Information Rights.**

(a)    The Corporation shall deliver the following reports to each Investor:

(i)    as soon as available, within (30) days after the end of each month of each fiscal year of the Corporation, consolidated and consolidating balance sheets of the Corporation and its Subsidiaries as of the end of such period, and consolidated and consolidating statements of income and cash flows of the Corporation and its Subsidiaries for the period then ended prepared in conformity with the historical practices of the Corporation;

(ii)    as soon as available and in any event within forty-five (45) days after the end of each of the first three quarters of each fiscal year of the Corporation, consolidated and consolidating balance sheets of the Corporation and its Subsidiaries as of the end of such period, and consolidated and consolidating statements of income and cash flows of the Corporation and its Subsidiaries for the period then ended prepared in conformity with GAAP, except as otherwise noted therein, and subject to the absence of footnotes and to year-end adjustments;

(iii)    as soon as available and in any event within ninety (90) days after the end of each fiscal year of the Corporation, a consolidated and consolidating balance sheet of the Corporation and its Subsidiaries as of the end of such year, and consolidated and consolidating statements of income and cash flows of the Corporation and its Subsidiaries for the year then ended prepared in conformity with GAAP, except as otherwise noted therein, together with an auditor's report thereon of a reputable firm;

(iv)    to the extent the Corporation (or any Subsidiary thereof) is required to prepare such financial statements (or obtain such audit letters), any financial statements actually prepared by the Corporation (or any such Subsidiary), or audit letters actually obtained by the Corporation (or any such Subsidiary) from any auditor of such financial statements, in each case as soon as available to the Corporation (or such Subsidiary); and

(v)    to the extent the Corporation (or any Subsidiary thereof) is required by law to prepare such reports, any annual reports, quarterly reports and other periodic reports pursuant to Section 13 or 15(d) of the Exchange Act actually prepared by the Corporation (or any Subsidiary thereof) as soon as available.

(b)    The Corporation and its Subsidiaries shall provide to each Investor, true and correct copies of all documents, reports, financial data and other information as an Investor may reasonably request. The Corporation shall permit any authorized representatives designated by an Investor to visit and inspect any of the properties of the Corporation and its Subsidiaries, including its and their books of account, and to discuss its and their affairs, finances and accounts with its and their officers, all at such times as an Investor may reasonably request.

(c)    The Corporation will give each Investor reasonable prior notice (it being agreed that substantially the same prior notice given to the members of the Board shall be deemed reasonable prior notice) of the time and place of any proposed meeting of the Board. The Corporation will deliver to each Investor copies of all material documentation distributed from time to time to the members of the Board or any applicable committee thereof, at such time as such documents are so distributed to them, including copies of any written consent. The Corporation reserves the right to withhold any such documentation if (i) access to such documentation could be reasonably expected to adversely affect the attorney-client privilege between the Corporation and its counsel or (ii) such disclosure is prohibited by an agreement with a third party; provided, however, that in the case of the preceding clause (ii), the Corporation will use commercially reasonable efforts to provide such documentation, which requirement shall be satisfied if the Investor is offered the opportunity to obtain such documentation by executing or otherwise becoming a party to the confidentiality restrictions on substantially the same terms (including any standstill provisions) as are applicable to the Corporation. Notwithstanding anything to the contrary contained in this Agreement, an Investor may not use or disclose any information received by such Investor, unless and except to the extent that such use or disclosure could have been made by a director of the Corporation in compliance with all laws and duties applicable to a director as such under such circumstances.

(d)    Each Investor shall have the right to consult with and advise the management of the Corporation and its Subsidiaries, upon reasonable notice at any time or from time to time, on all matters relating to the operation of the Corporation and its Subsidiaries.

**6.2.    Access to Records and Properties.**

Until the consummation of a QIPO, the Corporation shall permit any Investor and its employees, counsel and other authorized representatives, (collectively, "Authorized Representatives") during normal business hours and upon reasonable advance notice (which shall not be less than one-day's prior notice) to (a) visit and inspect the assets and properties of the Corporation and its Subsidiaries, (b) examine the books of accounts and records of the Corporation and its Subsidiaries, (c) make copies of such records and (d) discuss all aspects of the Corporation and its Subsidiaries with any officers, employees or accountants of the Corporation and its Subsidiaries; provided, however, that such investigation shall not unreasonably interfere with the operations of the Corporation and its Subsidiaries. The Corporation will instruct the accountants of the Corporation and its Subsidiaries to discuss such aspects of the financial condition of the Corporation and its Subsidiaries with any such Investor and its Authorized Representatives as such Investor may reasonably request, and to permit such Investor and its Authorized Representatives to inspect, copy and make extracts from such financial statements, analyses, and other documents and information (including electronically stored documents and information) prepared by the accountants with respect to the Corporation and its Subsidiaries as such Investor may reasonably request. The Corporation reserves the right to withhold any such documentation if (i) access to such documentation could be reasonably expected to adversely affect the attorney-client privilege between the Corporation and its counsel or (ii) such disclosure is prohibited by an agreement with a third party; provided, however, that in the case of the preceding clause (ii), the Corporation will use commercially reasonable efforts to provide such documentation, which requirement shall be satisfied if the Investor is offered the opportunity to obtain such documentation by executing or otherwise becoming a party to the confidentiality restrictions on substantially the same terms (including any standstill provisions) as are applicable to the Corporation. All costs and expenses incurred by such Investor and its Authorized Representatives in connection with exercising such rights of access shall be borne by such Persons, and all out-of-pocket costs and expenses incurred by the Corporation and its Subsidiaries in complying with any extraordinary requests by such Persons and its representatives in connection with exercising such access rights shall be borne by such Persons.

**6.3.    Expenses.**

The Corporation will pay, and hold the Investors and/or their respective representatives harmless against all liability for the payment of, (i) all costs and other expenses incurred from time to time by the Corporation or any of its Subsidiaries in connection with the Corporation's or any of its Subsidiaries' performance of and compliance with all agreements and conditions contained in this Agreement on its part to be performed or complied with, (ii) the out-of-pocket costs and expenses incurred by the Investors and any of their Affiliates at or prior to the consummation of the transactions contemplated by this Agreement (including fees and charges of counsel, accountants and other advisors) in connection with the purchase of the Equity Securities contemplated by the Purchase Agreement or any securities directly or indirectly issuable upon the conversion, exercise or exchange of such securities, (iii) the reasonable costs

and expenses (including fees and expenses of counsel, accountants and other advisors) incurred by the Investors and their Affiliates in connection with any amendment or waiver of, or enforcement of, any of the provisions of this Agreement, (iv) the reasonable and documented out-of-pocket costs incurred by the Investors and their Affiliates in sending their representatives to participate in meetings of the Board (or any committee thereof) of the Corporation or any of its Subsidiaries, (v) any reasonable and documented out-of-pocket expenses, including travel, transportation, hotel, lodging, per diem, telephone calls, dining and other similar expenses, incurred by the Investors or their Affiliates in providing any services related to the business, administration and policies of the Corporation on an ongoing basis, (vi) any reasonable and documented out-of-pocket costs incurred by the Investors or their Affiliates in rendering assistance to the Corporation or any of its Subsidiaries, to the extent the Corporation or such Subsidiary requested such assistance (it being understood that the Investors and their Affiliates shall not be obligated to render, and may charge additional fees for, such assistance), (vii) the fees and expenses incurred by the Investors and their Affiliates in any filing with any Governmental Entity with respect to its investment in the Corporation or in any other filing with any Governmental Entity with respect to the Corporation or any of its Subsidiaries that mentions the Investors or any of their Affiliates, and (viii) any stamp or similar taxes which may be determined to be payable in connection with the execution and delivery and performance of the Purchase Agreement and any of the transactions contemplated thereby, or any modification, amendment or alteration of the Purchase Agreement, and all issue taxes in respect of the issuance of any securities of the Corporation. The Corporation shall reimburse the Investors and/or their respective representatives for such expenses incurred in connection with the transactions contemplated by the Purchase Agreement out of the free cash flow generated by Viscern within three (3) months after the date of such reimbursement request, in an amount up to, but not to exceed, $400,000.

**6.4.    Additional Financing Commitment.** Viscern Holdings, LLC hereby expresses its good faith intention, as of the date hereof, to invest up to an additional aggregate amount of $20,000,000, in one or more tranches (the "Additional Financing") in the Corporation. Viscern Holdings, LLC shall have the sole and absolute discretion as to whether and when to consummate an Additional Financing. Notwithstanding the foregoing, Viscern Holdings, LLC has no obligation whatsoever to provide any such Additional Financing to the Corporation. The terms and conditions of any such Additional Financing (including whether such Additional Financing shall be in the form of Equity Securities or debt securities) shall be set by Viscern Holdings, LLC and approved by the Board.

**6.5.    Operational Commitment.** Viscern Holdings, LLC hereby expresses its good faith intention, as of the date hereof, to (i) have the Subject Business (as defined in the Purchase Agreement) operated exclusively by the Corporation and its wholly-owned Subsidiaries; and (ii) have the Corporation and its wholly-owned Subsidiaries be the vehicle for any acquisitions of businesses, the primary purpose of which is helping religious, philanthropic and other not-for-profit organizations plan and execute capital fundraising campaigns along with complementary consulting and other fundraising services. Notwithstanding the foregoing, Viscern Holdings, LLC has no obligation whatsoever to take or refrain from taking any action with respect to the foregoing matters.

# ARTICLE VII

# MISCELLANEOUS

**7.1.    Termination.**

This Agreement shall automatically terminate and be of no further force or effect as of the Termination Date.

**7.2.    Legend on Stock Certificates.**

Each certificate representing shares of capital stock that are subject to this Agreement shall bear a legend substantially in the following form:

"THE SALE, TRANSFER, ASSIGNMENT, PLEDGE, OR ENCUMBRANCE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE AND THE RIGHTS OF THE HOLDER OF SUCH SECURITIES IN RESPECT OF THE ELECTION OF DIRECTORS ARE SUBJECT TO A STOCKHOLDERS' AGREEMENT DATED DECEMBER 30, 2005 (AS IT MAY BE AMENDED, RESTATED OR OTHERWISE MODIFIED FROM TIME-TO-TIME), AMONG VISCERN HOLDING CORPORATION AND CERTAIN HOLDERS OF ITS OUTSTANDING CAPITAL STOCK. COPIES OF SUCH AGREEMENT MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OF VISCERN HOLDING CORPORATION."

**7.3.    Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.**

Other than with respect to matters relating to the internal governance of the Corporation, this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any law or rule that would cause the laws of any jurisdiction other than the State of New York to be applied. All matters which are the subject of this Agreement relating to matters of internal governance of the Corporation shall be governed and construed in accordance with the laws of the State of Delaware, without giving effect to any law or rule that would cause the laws of any jurisdiction other than the State of Delaware to be applied.

ANY ACTION OR PROCEEDING AGAINST THE PARTIES RELATING IN ANY WAY TO THIS AGREEMENT MAY BE BROUGHT AND ENFORCED IN THE COURTS OF THE STATE OF NEW YORK OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, TO THE EXTENT SUBJECT MATTER JURISDICTION EXISTS THEREFOR, AND THE PARTIES IRREVOCABLY SUBMIT TO THE JURISDICTION OF BOTH SUCH COURTS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING. EACH OF THE PARTIES IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF

VENUE OF ANY SUCH ACTION OR PROCEEDING IN THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY OR THE SOUTHERN DISTRICT OF NEW YORK AND ANY CLAIM THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN ANY INCONVENIENT FORUM. ANY JUDGMENT MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.

EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

**7.4.    Severability.**

It is the desire and intent of the parties that the provisions of this Agreement be enforced to the fullest extent permissible under the law and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, in the event that any provision of this Agreement would be held in any jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

**7.5.    Assignments; Successors and Assigns.**

Except in connection with any Transfer of Shares in accordance with this Agreement, the rights of each party under this Agreement may not be assigned. This Agreement shall bind and inure to the benefit of the parties and their respective successors, permitted assigns, legal representatives and heirs.

**7.6.    Amendments; Waivers.**

This Agreement may only be modified or amended by an instrument in writing signed by the Corporation and the holders of at least a majority of the outstanding Shares; *provided, however*, that any such amendment shall also require the prior written consent of the holders of at least a majority of the outstanding Management Stockholder Shares to the extent that such amendment materially adversely affects such Management Stockholders in a manner disproportionate to the other Shareholders. Any waiver of any provision of this Agreement requested by any party hereto must be granted in advance, in writing by the party granting such waiver. The holders of a majority of all then outstanding Investor Shares may grant a waiver or effect any modification or amendment on behalf of all Investors and the holders of a majority of all then outstanding Management Stockholder Shares may grant a waiver or effect any modification or amendment on behalf of all Management Stockholders.

**7.7.** **Notices.**

All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if contained in a written instrument delivered in person or sent by telecopy, nationally-recognized overnight courier or first class registered or certified mail, return receipt requested, postage prepaid, addressed to such party at the address set forth below or such other address as may hereafter be designated in writing by such party to the other parties:

> if to the Corporation:
>
> Viscern Holding Corporation
> c/o Flinn Investments, L.P.
> Three Greenwich Office Park, 2nd Floor
> Greenwich, CT 06831
> Attn: John Henry Moulton
> Facsimile: (203) 869-2056
>
> with a copy (which shall not constitute notice) to:
>
> King & Spalding, LLP
> 1185 Avenue of the Americas
> New York, New York 10036
> Attention: Dominick P. DeChiara
> Telephone: (212) 827-4098
> Facsimile: (212) 556-2222;

if to the Stockholders, to their respective addresses set forth on Annex I and II hereto with a copy to:

> Thompson & Knight L.L.P.
> 1700 Pacific Avenue, Suite 3300
> Dallas, Texas 75201-4693
> Attention: Amy R. Curtis
> Telephone: (214) 969-1763
> Facsimile: (214) 969-1751.

All such notices, requests, consents and other communications shall be deemed to have been delivered (a) in the case of personal delivery, on the date of such delivery, (b) in the case of delivery by telecopy or dispatch by nationally-recognized overnight courier, on the next business day following such delivery or dispatch and (c) in the case of mailing, on the third business day after the posting thereof.

**7.8.** **Headings.**

The headings of the sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

**7.9.    Nouns and Pronouns.**

Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

**7.10.    Entire Agreement.**

This Agreement contains the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings with respect to such subject matter. The parties hereto represent and warrant that there are no other agreements or understandings regarding any of the subject matter hereof other than as set forth herein and covenant not to enter into any such agreements or understandings after the date hereof except pursuant to an amendment, modification or waiver of the provisions of this Agreement.

**7.11.    Counterparts.**

This Agreement may be executed in any number of original or facsimile counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

**7.12.    Conflicting Agreements.**

No Stockholder shall enter into any stockholder agreements or arrangements of any kind with any Person with respect to any Equity Securities on terms inconsistent with the provisions of this Agreement (whether or not such agreements or arrangements are with other Stockholders or with Persons that are not parties to this Agreement), including agreements or arrangements with respect to the acquisition or disposition of Equity Securities in a manner which is inconsistent with this Agreement.

**7.13.    Third Party Reliance.**

Notwithstanding anything contained herein to the contrary, the covenants of the Corporation contained in this Agreement (a) are being given by the Corporation as an inducement to the Stockholders to enter into this Agreement (and the Corporation acknowledges that the Stockholders have expressly relied thereon) and (b) are solely for the benefit of the Stockholders. Accordingly, no third party (including, without limitation, any holder of capital stock of the Corporation) or anyone acting on behalf of anyone thereof other than the Stockholders, shall be a third party or other beneficiary of such covenants and no such third party shall have any rights of contribution against the Stockholders or the Corporation with respect to such covenants or any matter subject to or resulting in indemnification under this Agreement or otherwise.

**7.14.    Consultation with Counsel, etc.**

Each Stockholder who or which executes and delivers a counterpart signature page to this Agreement hereby acknowledges that he, she or it has had the opportunity to consult with his, her or its own counsel with respect to the subject matter of this Agreement, and has read and

understands all of the provisions of this Agreement. Each Stockholder who or which executes and delivers a counterpart signature page to this Agreement hereby further acknowledges that he, she or it has had the opportunity to ask questions of, and to seek additional information from, the Corporation with respect to each of the matters set forth herein.

**7.15.    Interpretation.**

Notwithstanding anything to the contrary contained herein or in the Bylaws, to the extent that any provision contained in this Agreement conflicts with any provision contained in the Bylaws, the provision contained in this Agreement shall govern.

**IN WITNESS WHEREOF**, the parties hereto have executed this Stockholders' Agreement on the date first written above.

**VISCERN HOLDING CORPORATION**

By: _____

Name: _____

Title: _____

**<u>INVESTOR</u>**

**VISCERN HOLDINGS, LLC**

By: _____

Name: _____

Title: _____

## MANAGEMENT STOCKHOLDERS

_____

RICHARD H. BLACKMON, an individual

_____

ROBERT E. CARTER, an individual

_____

DANIEL CONWAY, an individual

_____

TROY L. FIELDS, III, an individual

_____

CARL W. HEFTON, an individual

_____

WILLIAM D. TURNER, an individual

_____

ELLIOTT S. OSHRY, an individual

## MANAGEMENT STOCKHOLDERS

---

RICHARD H. BLACKMON, an individual

---

ROBERT E. CARTER, an individual

---

DANIEL CONWAY, an individual

---

TROY L. FIELDS, III, an individual

---

CARL W. HEFTON, an individual

---

WILLIAM D. TURNER, an individual

---

ELLIOTT S. OSHRY, an individual

## MANAGEMENT STOCKHOLDERS

_____

RICHARD H. BLACKMON, an individual

_____

ROBERT E. CARTER, an individual

_____
DANIEL CONWAY, an individual

_____

TROY L. FIELDS, III, an individual

_____

CARL W. HEFTON, an individual

_____

WILLIAM D. TURNER, an individual

_____

ELLIOTT S. OSHRY, an individual

## MANAGEMENT STOCKHOLDERS

RICHARD H. BLACKMON, an individual

ROBERT E. CARTER, an individual

DANIEL CONWAY, an individual

TROY L. FIELDS, III, an individual

CARL W. HEFTON, an individual

WILLIAM D. TURNER, an individual

ELLIOTT S. OSHRY, an individual

## MANAGEMENT STOCKHOLDERS

RICHARD H. BLACKMON, an individual

ROBERT E. CARTER, an individual

DANIEL CONWAY, an individual

TROY L. FIELDS, III, an individual

CARL W. HEFTON, an individual

WILLIAM D. TURNER, an individual

ELLIOTT S. OSHRY, an individual

**ANNEX I**

## INVESTORS

**Investor**                                        **Investor Shares**

Viscern Holdings, LLC
c/o Flinn Asset Management, LLC
Three Greenwich Office Park, 2nd Floor
Greenwich, CT 06831
Attn: John Henry Moulton
Facsimile: (203) 869-2056

In each case, with a copy (which shall not
constitute notice) to:

King & Spalding, LLP
1185 Avenue of the Americas
New York, New York  10036
Attention:  Dominick P. DeChiara
Telephone:  (212) 827-4098
Facsimile:  (212) 556-2222

**ANNEX II**

## MANAGEMENT STOCKHOLDER

**Management Stockholder**                    **Management Stockholder Shares**

Richard H. Blackmon


Troy L. Fields, III


Carl W. Hefton


Elliott S. Oshry


William D. Turner

**EXHIBIT A**

## STOCKHOLDERS' AGREEMENT JOINDER

By execution of this Joinder, the undersigned agrees to become a party to that certain Stockholders' Agreement dated as of December 30, 2005 among Viscern Holding Corporation, a Delaware corporation, and the Stockholders which are parties thereto (as the same may be amended, restated or otherwise modified from time-to-time). The undersigned shall have all the rights, and shall observe all the obligations, applicable to a Stockholder and [Investor] [Management Stockholder] thereunder.

Name: _____

Address for                                    with copies
Notices:                                       to:


_____              _____

_____              _____

_____              _____

_____              _____